IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
SOUTHERN DIVISION

DIANN B. JAMES,

    Plaintiff,

    v.                       Case No.: 09-CV-02136(AW)

VERIZON, *et. al*,

    Defendants.

**MEMORANDUM OPINION**

Plaintiff Diann James brought this action against Defendants Verizon Services Corporation ("Verizon") and her supervisor, Kenna Ashley, alleging violations of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e to 2000e-17, ("Title VII"), the Family and Medical Leave Act of 1993, as amended, 29 U.S.C. §§ 2601-54, ("FMLA"), the Americans with Disabilities Act of 1990, 42 U.S.C. §§ 12101-12213 ("ADA"),[1] and 42 U.S.C. § 1981. The matter currently before the Court is Defendants' motion for summary judgment. Doc. No. 55. The Court will grant the motion for the reasons stated below.

**I.     FACTUAL & PROCEDURAL BACKGROUND**

The Plaintiff, Diann James, is an African American woman who was terminated from her job with Verizon on September 22, 2006. In March 2004, after working for the company for

---

[1] Plaintiff's ADA claims arose prior to the enactment of the 2008 amendments. The version of the ADA in effect at the time of the relevant events controls the Court's analysis.

seven years, Plaintiff transferred into Verizon's EEO Compliance Division for the Washington Metropolitan Area and became a Senior Staff Consultant. The job entailed investigating internal and external complaints of discrimination and serving as a liaison to resolve complaints between employees and Verizon.

In her 2004 Performance Assessment, Plaintiff was given a rating of "Meets Expectations" by her supervisor and EEO manager, an African American man named Greg Miles. In his review, Miles noted that Plaintiff was a new investigator[2] and lauded her communication and organizational skills.

After an office reorganization in 2005, Miles was transferred, and Kenna Ashley, a white female, became the new EEO Manager. In March 2006, Ashley conducted a year-end review of Plaintiff's 2005 performance. Because Ashley was on maternity leave for much of 2005, she used the comments and assessments of those who supervised Plaintiff in her absence to complete the evaluation. Ashley rated Plaintiff as "Performing"[3] and noted throughout the evaluation the many strengths that she saw in Plaintiff's work. Doc. No. 59-1, Ex. 7.

Dispersed throughout the positive commentary, however, were several notes about where Plaintiff could improve her performance. For example, Ashley noted that Plaintiff needed to "continue working on evaluating all information prior to a conclusion." *Id.* In April 2006, following the evaluation, Ashley outlined specific performance objectives for Plaintiff to focus on during 2006. The areas for improvement were: 1) the timeliness of investigations and documentation; 2) EEO analysis/communication; 3) the quality of oral and written

---

[2] "While lacking the experience of some of the other EEO investigators, Diann has made a positive impact and achieved solid results." Doc. No. 59-1, Ex. 4 at 6.
[3] According to the Assessment, a rating of "Performing" means an "[e]mployee sustained performance meeting objectives, requirements and expectations and periodically exceeded them." Doc. No. 59-1, Ex. 7.

communication; and 4) personal development, including attendance at courses regarding EEOC training and communication.  *See* Doc. No. 56, Ex. A at 11.

In an effort to fulfill the fourth objective, Plaintiff registered to attend a multi-day training session, known as a Technical Assistance Program Seminar ("TAPS"), scheduled to begin June 27, 2006.  Ultimately, however, Plaintiff decided not to attend the TAPS seminar for the work-related reasons described below.

In May or June of 2006, Plaintiff was the primary investigator assigned to look into allegations of sexual harassment lodged by a female employee, Lisa Willey, against a senior director within Verizon named William Williams.  It is undisputed that the case was widely regarded as high-profile and sensitive due to the seniority of the defendant.  On or about June 26, Plaintiff received a phone call from the president of the work group that employed the complainant and the accused.  The president asked Plaintiff to conduct her interview of the accused on June 27, the same day that Plaintiff was scheduled to attend the TAPS training seminar.  Plaintiff cancelled her seminar registration and conducted the interview as requested.

Plaintiff contends that she was acting in the best interest of the investigation by ensuring a timely interview.  However, Ashley, Plaintiff's supervisor, expressed that Plaintiff should not have allowed management to dictate the course of the interview.  Ashley informed her supervisor, Tammy Jeffers, that management was attempting to influence the investigation.

By late June, Plaintiff had completed her investigation.  She determined that the accused had lied during the interview and ultimately recommended that he be terminated.  Soon after, the president of the accused's work group called Catherine Carney, the superior to Jeffers, Ashley, and Plaintiff.  According to Carney, the president of the work group was distraught over the

termination recommendation and expressed that Plaintiff had been biased in the way she conducted the investigation. The president asked Carney to "get involved." Jeffers relayed this information to Plaintiff and asked for Plaintiff's materials, even though Plaintiff told Jeffers the materials were not ready for review. *See* Doc. No. 60, Ex. 1 at 287; *id.*, Ex. 5 at 255. Within several weeks, Carney reinvestigated the matter independently of Plaintiff. Both sides agree that it was "unprecedented" for Carney to re-do a completed investigation in this fashion. Doc. 56, Ex. A at 49; Doc. No. 60, Ex. 5 at 253.

Defendants claim that during that investigation, Plaintiff did not follow through with a telephonic interview of an important witness that had been cut short by a power outage, resulting in a perception that the interview had been conducted unfairly. Plaintiff agrees that the interview was cut short, but she claims that she already had the information she needed from that witness. Defendants also assert that when Plaintiff turned over the investigative file, it was disorganized, missing key documents, and contained illegible and inaccurate notes. Plaintiff acknowledges that the file was not in top shape, but explains this fact by pointing out that it was a working file, and that when Jeffers demanded the file, Plaintiff was not given the opportunity to polish its contents.

On July 11, Ashley and Jeffers, an African American, placed Plaintiff on a Performance Improvement Plan ("PIP"). The PIP identified four alleged deficiencies in Plaintiff's performance in 2006: 1) failure to use good judgment in managing and analyzing her caseload, 2) Plaintiff's need to improve the quality of her oral and written communications, 3) failure to manage and control an investigation when a director in another organization attempted to exclude her from a meeting during an EEO investigation, and 4) lack of concision and clarity in written and verbal communications. The PIP provided 60 days for Plaintiff to improve in those

4

areas. Plaintiff was informed that she could be terminated if she had not made progress after the 60 days.

Plaintiff alleges that by September, her recurring vision problems began to prevent her from driving and reading. She informed Ashley that she would be taking sick leave during the week of September 11 and submitted the formal request for leave pursuant to the FMLA on September 13. The same day, Ashley, Jeffers, and Carney met and unanimously agreed that there were major and ongoing concerns with Plaintiff's performance that justified her termination. Plaintiff was not informed of her termination at that time, as she was not at the office.

On September 18, Ashley called Plaintiff to inquire about her wellness. Plaintiff told Ashley that she was not yet prepared to return to work, but they agreed that Plaintiff could work from home. On September 22, Ashley asked Plaintiff to come into the office to go over the status of her PIP. Plaintiff's husband drove her to the office to attend the meeting, and she was then informed that she had not successfully completed the requirements of her PIP, and that her employment was terminated, effective immediately. Within approximately ten months, Gertrude "Tasha" Montgomery, also an African American woman, filled Plaintiff's former position.

On October 2, Plaintiff received notification that Defendants had approved her for retroactive FMLA leave, beginning on September 13. After seeking reinstatement through internal Verizon channels and exhausting her remedies with the EEOC, she filed the instant lawsuit in July 2008 before the United States District Court for the District of Columbia. The case was subsequently transferred to this Court. *See* Doc. No. 10. The case is now before the Court to resolve Defendants' motion for summary judgment. *See* Doc. No. 55.

## II. STANDARD OF REVIEW

Summary judgment is only appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 323-25 (1986). The Court must "draw all justifiable inferences in favor of the nonmoving party, including questions of credibility and of the weight to be accorded to particular evidence." *Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496, 520 (1991) (*citing Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)).

To defeat a motion for summary judgment, the nonmoving party must come forward with affidavits or other similar evidence to show that a genuine issue of material fact exists. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). A disputed fact presents a genuine issue "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson,* 477 U.S. at 248. Although the Court should believe the evidence of the nonmoving party and draw all justifiable inferences in his or her favor, a party cannot create a genuine dispute of material fact "through mere speculation or the building of one inference upon another." *Beale v. Hardy*, 769 F.2d 213, 214 (4th Cir. 1985).

## III. ANALYSIS

### A. Hostile Workplace Environment

To begin with, Plaintiff's hostile-workplace-environment theory for recovery under Title VII is unfounded. This claim requires Plaintiff to establish the existence of harassment that is "(1) unwelcome, (2) because of [race], (3) sufficiently severe or pervasive to alter the conditions of employment and create an abusive atmosphere, and (4) imputable to the employer." *EEOC v. Sunbelt Rentals, Inc.,* 521 F.3d 306, 313 (4th Cir. 2008). Plaintiff's position falters on the second and third elements.

Plaintiff can show, at most, that she was erroneously accused of conducting a biased investigation, unjustifiably placed on a PIP, and improperly summoned to work while she was on leave in order to terminate her employment. None of these actions were based on her race, as the Court will explain below when evaluating her race-discrimination claims. *See infra* section III.C. However, even accepting the assumption that the events were motivated by race, they do not constitute harassment. *See, e.g.*, *Jennings v. Univ. of N.C.*, 482 F.3d 686, 695 (4th Cir. 2007) (explaining that harassment behavior encompasses acts that are "aimed to humiliate, ridicule, or intimidate"). Much less do they amount to harassment that is "severe," *Sunbelt Rentals, Inc.*, 521 F.3d at 313, "pervasive," *id.*, "demeaning, unrelenting, and widespread," *Harris v. L & L Wings, Inc.*, 132 F.3d 978, 984 (4th Cir. 1997). Thus, Plaintiff's hostile-workplace-environment claim must be dismissed.

### B. ADA and FMLA

The ADA prohibits employers from "discriminat[ing] against a qualified individual on the basis of disability in regard to [the] discharge of employees." 42 U.S.C. § 12112(a). Plaintiff asserts that "[d]espite [her] request for an accommodation in the form of leave, Verizon

7

terminated Plaintiff from her job without just cause because of her disability." Am. Compl. ¶ 57. Similarly, the FMLA provides that employers may not "interfere with, restrain, or deny the exercise of . . . any [FMLA] right." 29 U.S.C. § 2615(a). Plaintiff contends that Defendants violated the FMLA by "ordering Plaintiff to appear at work on September 22," during her FMLA leave, "to be terminated because of her serious health condition." Am. Compl. ¶¶ 75-76.

Neither of these theories is viable. To begin with, even assuming that Plaintiff was disabled during the relevant time period—an assumption that Defendants dispute—it is undisputed that Verizon's principal reasons for firing Plaintiff relate to her investigation of Willia *See, e.g.*, Doc. No. 55-1 at 7-8 (Defendants' motion for summary judgment) ("One of the most serious problems during this period was Plaintiff's handling of a very sensitive, high profile case."); Doc. No. 59 at 22-23 (Plaintiff's opposition to Defendants' motion for summary judgment) ("To be sure, the importance of the Willey case to Verizon can hardly be overstated."); *id.* at 25 ("Verizon now admits that it terminated Plaintiff . . . because it believed, wrongly, that she could not be objective when she evaluated accusations lodged against a senior white manager."). This theory of Verizon's motivations leaves no room for Plaintiff's speculative suggestion that she was terminated because of her disability and/or because she requested FMLA leave.[4]

Plaintiff's counsel all but conceded this point during oral argument by acknowledging that Verizon's perception of the investigation—not Plaintiff's disability or her request for FMLA

---

[4] To be clear, the Parties have dramatically different positions regarding the significance of Verizon's investigation-related reason for firing her. Defendants contend that Plaintiff's investigation of Williams was unprofessional and incomplete, giving rise to a perception of bias; by contrast, Plaintiff argues that Verizon's accusation of bias fundamentally derives from the fact that she was a black woman investigating a powerful white man. This dispute is relevant to Plaintiff's race-discrimination theory, and therefore it will be discussed at greater length below. *See infra* section III.C. However, Plaintiff's FMLA and ADA claims fare no better under her own theory of why she was terminated than they do under Defendants' interpretation of the facts.

8

leave—was the primary reason for her termination. *See* Doc. No. 65 at 21 ("The reason for the termination was because a white employee accused her of exhibiting bias in the investigation."). Counsel attempted to salvage the ADA and FMLA claims by suggesting that her disability and/or FMLA request influenced the timing of her termination. *See id.* at 29 ("My argument is that she was terminated because of what they say was bias against this white manager. But the fact that she was out on disability I would argue was a factor in their determination as to when they were going to terminate her."). In other words, even though she would have been fired on the basis of the investigation regardless of her disability and/or FMLA request, the latter resulted in Verizon firing her more quickly than it otherwise would have.

The problem with this variation on Plaintiff's position is that it is based entirely on speculation and is contradicted by the facts in the record. Although there was a close temporal proximity between the time when Plaintiff announced that she would be on leave (September 11) and the date she was informed of her termination (September 22), mid-September is also when Plaintiff's PIP period came to an end.[5] It was therefore completely predictable and legitimate that Plaintiff's supervisors would take a fresh look at Plaintiff's performance around that time in order to determine whether Plaintiff had satisfactorily completed her PIP objectives.

And that is precisely what happened. On September 13, Ashley, Jeffers and Carney met and unanimously agreed that Plaintiff had not fulfilled her PIP expectations and therefore should be terminated. On September 22, Ashley summoned Plaintiff to work and informed her that she had not satisfied her PIP and would be terminated. Thus, the temporal proximity between Plaintiff's leave status and her termination is fully accounted for by non-invidious motivations

---

[5] She was placed on her sixty-day PIP on July 11, 2006. Thus, the PIP period came to a conclusion in mid-September.

and circumstances, and Plaintiff has presented no facts other than temporal proximity upon which a jury could infer that her disability and/or FMLA request played any role whatsoever in her termination. Where, as here, "[t]he actions that led to [Plaintiff's] termination began before" her disability and/or FMLA leave became potential issues, "'an inference of [improper motive] does not arise.'" *Francis v. Booz, Allen & Hamilton, Inc.*, 452 F.3d 299, 309 (4th Cir. 2006) (quoting *Slattery v. Swiss Reins. Am. Corp.*, 248 F.3d 87, 95 (2d Cir. 2001)). Thus, the ADA and FMLA claims must be dismissed.

### C. Racial Discrimination

Race-discrimination claims under Title VII and section 1981 are subject to the burden-shifting framework laid out by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Love-Lane v. Martin*, 355 F.3d 766, 786 (4th Cir. 2004). Plaintiff must first establish a *prima facie* case of discrimination, which requires establishing the following elements: "(1) she is a member of a protected class; (2) she suffered adverse employment action; (3) she was performing her job duties at a level that met her employer's legitimate expectations at the time of the adverse employment action; and (4) the position remained open or was filled by similarly qualified applicants outside the protected class." *Hill v. Lockheed Martin Logistics Mgmt., Inc.*, 354 F.3d 277, 285 (4th Cir. 2004). If Plaintiff satisfies this burden, "the burden shifts to the employer to establish a legitimate non-retaliatory reason for the action." If the employer does so, Plaintiff "then must show that the employer's proffered reasons are pretextual." *Price v. Thompson*, 380 F.3d 209, 212 (4th Cir. 2004).

The record is devoid of any direct evidence of racial discrimination, but Plaintiff suggests that a reasonable jury could infer discriminatory motive from circumstantial evidence. She asserts that Verizon perceived bias and misconduct in her investigation of Williams, not because of any objective mistakes she made, but rather because she, a black woman, recommended sanctioning a white man with a position of power in the company. Furthermore, she contends that Verizon sought to cover up this invidious motive by placing her on a PIP, devising pretextual justifications for imposing the PIP (*i.e.*, that Plaintiff needed to work on the quality of her oral and written communication), and terminating her on the false pretense that she failed to satisfy the PIP objectives.

The central problem with Plaintiff's theory, however, is that Verizon has identified concrete facts to support its negative perception of the Williams investigation. Particularly revealing is Jeffers' summary of the alleged deficiencies in the way Plaintiff conducted the investigation, which she prepared on July 28, 2006 after discussing the investigation with Plaintiff. *See* Doc. No. 61, Ex. D. Jeffers, an African American woman, stated that the investigative file was "appalling, lacked professionalism," and failed to "follow a clear chronology of events." These defects "created clear credibility issues related to this investigator's ability to appropriately investigate this very sensitive issue." *Id.*

Jeffers also identified several specific areas where information in the file was incomplete at the time Plaintiff arrived at her conclusions about the case, suggesting that she made her decision "based on feelings" and preconceptions, not the facts. Even more seriously, Jeffers indicated that some of the facts in the file were inaccurate, and that several different witnesses independently complained to her that Plaintiff "had drawn a conclusion and did not really care

about what they had to say." As a result, Jeffers concluded that it would be necessary to "completely re-interview everyone in this case again." *Id.*

Tellingly, in her deposition, Plaintiff corroborates many of the core facts that led Verizon to perceive her investigation as biased. For instance, Plaintiff acknowledges that a power outage had disrupted her telephonic interview with a witness "right in the middle of our conversation," and that the witness "had expressed that [he] had more to say and did not feel like [he] had a chance to say it." Doc. No. 62, Ex. B at 137, 140. Furthermore, Plaintiff acknowledges in her memorandum in opposition to Defendants' motion for summary judgment that when she was asked to turn over the case file, it was a "working file" that she was "in the process of organizing." Doc. No. 59 at 10.

Needless to say, Plaintiff does not agree with the entirety of Verizon's account. For each of the undisputed facts mentioned above, Plaintiff has articulated a defense of her actions. For instance, she claims that the investigative file was disorganized only because she was forced to turn it over to her supervisor without adequate warning, *see id.*, and that she decided to cut short her witness interview because she was satisfied that she had acquired all the relevant information that he had to offer, *see* Doc. No. 62, Ex. B at 137.

However, the question before the Court is not whether Verizon's evaluation of her performance was "'wise, fair, or even correct.'" *DeJarnette v. Corning Inc.*, 133 F.3d 293, 299 (4th Cir. 1998) (quoting *Giannopoulos v. Brach & Brock Confections, Inc.*, 109 F.3d 406, 411 (7th Cir. 1997)). Rather, the question is whether non-race-related performance concerns "'truly [were] the reason[s] for the plaintiff's termination.'" *Id.* Plaintiff's excuses may call into question Verizon's judgment, but they fundamentally confirm Verizon's sincerity by conceding

12

that the facts that led Verizon to question Plaintiff's investigation—a witness interview that was cut off and never pursued further; a disorderly investigative file given to Plaintiff's supervisors; *etc.*—truly took place.  Thus, the record provides no basis upon which a reasonable juror could find that Verizon's stated motive for terminating Plaintiff is insincere or that Verizon's perception of bias and unprofessionalism in Plaintiff's investigation was based on her race.

Several other factors further confirm this conclusion.  The first is that Jeffers, an African American woman, was one of the persons who reviewed Plaintiff's investigation and deemed it to be biased and unprofessional.  The brief report documenting her impressions has been discussed at length above.  *See supra*; *see also* Doc. No. 61, Ex. D.  This detail is significant because "[p]roof that the decision-maker is a member of the same protected class as Jackson weakens any possible inference of discrimination."  *Jackson v. Sch. Bd. of the City of Richmond*, Civ. No. 3:99cv642, 2000 U.S. Dist. LEXIS 4474 at *22 (E.D. Va. Mar. 15, 2000).

It is true that the facts of *Jackson* do not directly parallel those of the case at bar, because here (unlike in *Jackson*) there were multiple decision-makers, not all of whom were members of Plaintiff's protected class.  Nonetheless, the fact that Jeffers took the lead in documenting the flaws in Plaintiff's investigation casts further doubt on the hypothesis that Verizon's bias-related accusations were linked to race.

Second, it is undisputed that Plaintiff was ultimately replaced by Tosha Montgomery, also an African American woman.  This is problematic for Plaintiff because, "as a general rule, Title VII plaintiffs must show that they were replaced by someone outside their protected class." *Miles v. Dell, Inc.*, 429 F.3d 480, 486 (4th Cir. 2005).  The rationale for this rule is that "replacement within the protected class gives rise to an inference of non-discrimination with

respect to the protected status." *Id.* at 488. In accordance with the rule's underlying purpose, it is subject to exceptions when, "because of the particular circumstances surrounding the replacement hiring decision, the employer's decision to hire someone of the plaintiff's protected class as a replacement does not give rise to an inference of non-discrimination with respect to the decision to fire the plaintiff." *Id.* at 489.

Plaintiff is correct that the temporal lag between the time she was fired and the time Montgomery was hired—here, ten months—mitigates the force of the non-discrimination inference that arises from hiring a replacement within the protected class. *See, e.g.*, *Howard v. Roadway Express, Inc.*, 726 F.2d 1529, 1535 (11th Cir. 1984) ("[T]he lapse of eleven months would significantly diminish the reliability of the subsequent hiring as an indicator of Roadway Express' intent at the time it rejected Howard's application."). Nonetheless, this detail does contribute to the overwhelming cumulative case indicating that Plaintiff was terminated because of Verizon's legitimate concerns about her investigative work, and not because of her race. Thus, Defendants are entitled to summary judgment on the race-discrimination claims.

## IV. CONCLUSION

For the reasons stated above, the Court grants Defendants' motion for summary judgment. Doc. No. 55. A separate order will follow.

| | |
|---|---|
| <u>June 20, 2011</u> | <u>/s/</u> |
| Date | Alexander Williams, Jr. |
| | United States District Judge |

14